L2NHBELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                      15 Cr. 537 (VEC)

WENDELL BELLE,

                                        Resentence
                Defendant.

------------------------------x

                                        New York, N.Y.
                                        February 23, 2021
                                        2:10 p.m.


Before:

                    HON. VALERIE E. CAPRONI,

                                        District Judge

                            APPEARANCES

AUDREY STRAUSS
        Acting United States Attorney for the
        Southern District of New York
GINA CASTELLANO
        Assistant United States Attorney

JEFFREY G. PITTELL
        Attorney for Defendant

L2NHBELS

1              (Case called)

2              MR. CASTELLANO:  Good afternoon, your Honor.  Gina

3      Castellano for the government.

4              THE COURT:  Good afternoon.

5              MR. PITTELL:  Good afternoon, your Honor.  Jeffrey

6      Pittell appearing with Mr. Belle.

7              THE COURT:  Good afternoon, Mr. Pittell.

8              Good afternoon, Mr. Belle.

9              THE DEFENDANT:  Good afternoon.

10             THE COURT:  Please be seated, everybody.

11             Mr. Pittell, have you and your client read the

12     presentence report dated July 25, 2017, and the supplemental

13     PSR that was filed on April 15, 2020?

14             MR. PITTELL:  Yes, we both read it and had sufficient

15     time to discuss both.

16             THE COURT:  Terrific.  Mr. Belle, did you read the

17     presentence report and the supplemental presentence report?

18             THE DEFENDANT:  Yes, ma'am.

19             THE COURT:  All right.  Mr. Pittell, do you have any

20     objections to the report?

21             MR. PITTELL:  No, I do not.

22             THE COURT:  All right.  The presentence report and the

23     supplemental presentence report will be made part of the record

24     in this matter and placed under seal.

25             If an appeal is taken, counsel on appeal may have

L2NHBELS

1   access to the sealed report without further application to this

2   Court.

3            The sentencing submission -- you know what, excuse me.

4   This is the first time I've seen Mr. Belle since 5(f) got

5   amended.

6            Mr. Belle, Congress, in their infinite wisdom, changed

7   the law since you were last sentenced, and this is the first

8   time I've seen you since the new law went into effect.

9            THE DEFENDANT:  Yes.

10           THE COURT:  Under the new law, the first time I see a

11   defendant, I have to remind the government of its obligations

12   to disclose favorable information to the defense.  So since

13   this is the first time I've seen you since the new law went

14   into effect, let me take care of this, and we'll get back to

15   your sentence.

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  Ms. Castellano, I direct the prosecution

18   to comply with its obligations under *Brady v. Maryland* and its

19   progeny to disclose to the defense all information, whether

20   admissible or not, that is favorable to the defendant, material

21   either to guilt or to punishment, and known to the prosecution.

22   Possible consequences for noncompliance may include dismissal

23   of individual charges or the entire case, exclusion of

24   evidence, and professional discipline or court sanctions on the

25   attorneys responsible.  I have previously entered a written

L2NHBELS

 1    order in this case, I believe, but if not, I will enter it

 2    today more fully describing this obligation and the possible

 3    consequences of failing to meet it.  And I direct you to review

 4    and to comply with that order.

 5         Ms. Castellano, do you confirm that you understand

 6    your obligations and have fulfilled them?

 7         MR. CASTELLANO:  Yes, your Honor.

 8         THE COURT:  OK.  I received a sentencing submission

 9    from the defense dated October 27, 2020, which included a

10    letter from Mr. Belle -- letters from Mr. Belle, his mother,

11    his girlfriend, and two nephews.  I then received a letter

12    dated November 3, 2020, which included a BOP work evaluation

13    which was very positive, and on November 4, 2020, a letter

14    providing Mr. Belle's explanation of several disciplinary

15    incidents which occurred when he was in state custody.

16         I also re-reviewed the defense submission from the

17    original sentence in 2017.  And today I received a letter

18    dated -- it was actually dated November 4, 2020, but it was

19    filed February 22, 2021, not exactly explaining the most recent

20    disciplinary incidents that Mr. Belle has experienced, but

21    generally challenging the BOP system as not being a fair

22    system.

23         I received letters from the government dated

24    October 27, 2020, and November 3, 2020.  As with defense

25    submissions, I also reviewed the materials submitted by the

L2NHBELS

1    government in connection with the initial sentence.

2              I also received a complete copy of Mr. Belle's state

3    and federal disciplinary record and the last six months of

4    Bureau of Prisons medical records.  Then on February 22, I

5    received another letter from the government which provided

6    additional disciplinary incidents involving Mr. Belle mostly

7    from -- I think all from January, and there were several

8    different incidents that were involved.

9              All right.  So defendant's conviction on Count One is

10   vacated.  Following the Supreme Court's decision in *United*

11   *States v. Davis*, racketeering conspiracy is not a valid

12   predicate for a 924(c) charge.  Vacating the Count One

13   conviction also affects the mandatory minimum sentence for

14   Count Two.  Rather than a mandatory minimum of 25 years

15   consecutive, Count Two now carries a mandatory minimum sentence

16   of ten years consecutive.  The guidelines for Count Two is the

17   mandatory minimum.  The maximum sentence is any term of years.

18             Defendant's argument is that the sentence I impose

19   should include credit for defendant's time spent in state

20   prison.  I disagree legally because this is not a *Rivers*

21   situation.  Congress has required 924(c) sentences to run

22   consecutive to any other sentence, which includes the state

23   sentence that Mr. Belle is currently serving.  That said, my

24   sentence will take into account the fact that when he begins to

25   serve it, he will have already spent nine years in jail, and I

L2NHBELS

would impose the same sentence even if the defendant were

legally correct that I have discretion to run the sentence

concurrent with his undischarged state sentence.

It is important to the sentence I am going to impose.

Even if it has no effect on the guidelines calculation, it is

worth reviewing Mr. Belle's criminal history.  Mr. Belle began

his violent criminal history early.  He has a June 2007

juvenile adjudication for murder that he committed at the age

of 13.  He received five years in a juvenile facility.  That

generates two criminal history points.  On October 2011, he was

convicted for criminal possession of a weapon.  That's two

criminal history points.  June 2015, he was convicted of

attempt murder.  That's the nine-year sentence that he's

currently serving.  That's three criminal history points.

Seven criminal history points puts Mr. Belle in criminal

history category IV.  It's unusual to have a criminal history

category that high at such a young age, particularly since most

of Mr. Belle's young adulthood has been spent in jail.

Are there any guidelines issues that I haven't

addressed, Ms. Castellano?

MR. CASTELLANO:  No, your Honor.

THE COURT:  Mr. Pittell?

MR. PITTELL:  No.

THE COURT:  A downward departure is not possible

because of the mandatory minimum.  On the other hand, there are

L2NHBELS

| | |
|---|---|
| 1 | grounds for an upward variance.  As I said the first time |
| 2 | around, the circumstances of the murder of Mr. Lora are outside |
| 3 | the heartland of murders.  The fact that, in addition to the |
| 4 | Lora murder, Mr. Belle personally participated in other |
| 5 | shootings where people were killed and injured puts this case |
| 6 | well outside the heartland of 924(c) cases. |
| 7 | Are there any factual issues in dispute? |
| 8 | MR. CASTELLANO:  No, your Honor. |
| 9 | MR. PITTELL:  No. |
| 10 | THE COURT:  OK.  Would the government like to be heard |
| 11 | on sentencing?  Before I say that, let me also -- this is going |
| 12 | to go to everybody.  Mr. Belle has told me in his letters that |
| 13 | he is no longer a Young Gunnaz.  To the extent anybody can shed |
| 14 | any light on exactly what that means, let me know.  For |
| 15 | example, does that mean that he communicated to other Young |
| 16 | Gunnaz to say I'm not in the gang anymore?  Does it mean he |
| 17 | told the government, I'll tell you everything I know about the |
| 18 | Young Gunnaz?  Does it just mean that in his head he's decided |
| 19 | he's no longer a Young Gunna?  To the extent there's any color |
| 20 | that you can put around that declaration, I'd appreciate it. |
| 21 | And also, I see that Mr. Lora's mother -- |
| 22 | MS. LORA:  Sister. |
| 23 | THE COURT:  Sister is here.  Would you like to speak? |
| 24 | MS. LORA:  Yeah. |
| 25 | THE COURT:  Would you come to the microphone, then. |

L2NHBELS

1    Would you state your name.

2              MS. LORA:  Jessica Lora.

3              THE COURT:  Jessica Lora.  That's L-o-r-a.

4              Go ahead, Ms. Lora.

5              MS. LORA:  If you could go back in time, what would

6    you do different from what you did?

7              THE DEFENDANT:  Answer that?

8              THE COURT:  Yes.

9              THE DEFENDANT:  I would have did what I first did, ran

10   the other way.  Originally, that's what I originally did.  I

11   would have just went the other way, but he -- he fell.

12   That's -- I couldn't do nothing else.

13             THE COURT:  I'm sorry.  Mr. Belle, you can't mumble,

14   though.

15             THE DEFENDANT:  It's the mask.  It's the mask.  I

16   could take it down.

17             THE COURT:  No, you can't take it down.

18             THE DEFENDANT:  I'm saying, like, I went the other

19   way.  Like, I went the other way, and he happened -- he was on

20   the floor, and I just went back.  If I could any way, like, I

21   would have stopped it if I could, seriously.

22             MS. LORA:  Did you notice how small he was?

23             THE COURT:  I'm sorry.  Did you know what?

24             MS. LORA:  Did he notice how small he was?

25             THE COURT:  Did you know how small he was?

L2NHBELS

1              MS. LORA:  Yeah.

2              THE DEFENDANT:  From my point, yeah, of course, yeah.

3     Yes, I did.  I knew him personally, like, since he was five

4     years old.  So it did affect me.  It did affect me a lot, me

5     doing that.  Like, I'm not going to sit here and act like

6     that's something to be proud of me doing.  I never -- like,

7     like, yeah, I did it.  I went in and let the liquor get control

8     of me, and I did what I did.  I ain't mean to do that, though.

9     I swear to you I didn't mean for it to go like that.  Honestly.

10    I know Chichi.  I know all of them.  So it did affect me.  It

11    did affect me a lot.

12             MS. LORA:  Was he asking you to stop?  Was he asking

13    you to stop?

14             THE DEFENDANT:  I can't -- I don't recall.  I don't

15    really recall this whole -- I let the liquor get over me.  I'm

16    not blaming it on the liquor.  It's no excuse.  I apologize.  I

17    know -- I know apology ain't going to bring him back, but if I

18    could do something to make you feel better, I would.  But I

19    know, like, you losing somebody, it will never bring him back

20    because I took him from you.  And I'm sorry, like, sorry,

21    honestly.

22             Honestly, like, I don't know what else I can say to

23    change it, but if I could go back in time, I would have stopped

24    that whole thing.  I would have really stopped it because

25    now -- because I'm -- I'm not only going through legal with

L2NHBELS

1    this, this is -- I got a cut on my face from that, from doing

2    that to that young man.  So I know -- I know, like, every day

3    I'm going through with the legal and the legal things.  So it's

4    people inside jail that I got to deal with due to this, to

5    committing this crime, and I got to deal with the courts.  So

6    it's like -- but if I could take it back to stop all this, I

7    would, so I could be back home with my son, my family.  I mean,

8    everybody else suffering the same way.  Your mother is sick --

9    sick.  My mother's sick, going through it too.

10              So, like, I just apologize to you, my mother, my

11   family, like, your mother.  Like, when y'all came from -- when

12   I -- when I pled guilty and y'all was sitting there and I seen

13   Chichi, like, that affected me a lot seeing your brother there,

14   your other brother.  So it brought back memories from me

15   sleeping in y'all house and everything from when I was little.

16   And I'm sorry.  I don't -- I don't know what else I could say

17   to you, Jessica.

18              MS. LORA:  I'm sorry too.  I feel bad for what you're

19   going through too.  I know you're --

20              THE DEFENDANT:  I guess I deserve it.  I guess this is

21   what I got to go through for what I did, for the things I did,

22   so --

23              MS. LORA:  Thank you.

24              THE DEFENDANT:  You're welcome.

25              MS. LORA:  Thank you.

L2NHBELS

1           THE COURT:  Thank you.

2           Ms. Castellano.

3           MR. CASTELLANO:  Your Honor, the government strongly

4    believes that the Court should impose the same sentence that it

5    imposed back in August of 2017, and that's because,

6    unfortunately, nothing has changed that's before your Honor.

7    The defendant's criminal history hasn't changed.  The terrible,

8    terribly violent conduct that he committed as a high-ranking

9    member of the YGs hasn't changed.  And his behavior since he's

10   been in prison hasn't changed.  Your Honor already went through

11   his criminal history of murder at the age of 13 and talked a

12   bit about the terrible conduct, the violence, shooting after

13   shooting, as a high-ranking member of the YGs, a gang that

14   terrorized the neighborhoods in the South Bronx and other areas

15   of the Bronx.

16           Obviously, the most egregious of that conduct was the

17   stomping murder of Moises Lora, Jessica's brother.  It just

18   stands out separate and apart from all of the other violence

19   because it was just so awful.  Hearing Mr. Belle say today that

20   he didn't mean it is striking because he used his own feet to

21   crush Moises' skull, repeatedly stomping on him, a frail,

22   90-pound 16-year-old boy.  He had that blood on the bottom of

23   his jeans when he went and talked to his buddies after.  He

24   bragged about that murder.  And it didn't stop him.  To hear

25   him say today that it affected him, it may be affecting him

L2NHBELS

1    now, but he continued violence after that, shooting somebody

2    through the car window, almost killing them.

3              Nothing about that murder, about Mr. Belle's conduct

4    or the murder of Moises Lora can be changed.  The Lora family

5    is going to have to live with that forever, with that.  The

6    only thing that could have changed between August of 2017.  And

7    sitting here today is Mr. Belle, and he's written to the Court.

8    He's spoken a bit.  But that same sentiment, when you look back

9    at the transcript from the original sentencing, it's there.

10   Words are meaningless without actions, and so looking at

11   Mr. Belle's actions is what, I submit, matters.  And I detailed

12   for the Court in the government's submissions Mr. Belle's

13   conduct while in prison, in state custody:  November 30, 2017,

14   attacking another inmate from behind, using a spoon to make

15   stabbing motions at the other inmate.  December 2, 2019,

16   cutting another inmate on the head, causing an injury that

17   required 16 sutures.  Then he comes back to federal custody for

18   this resentencing, and he's attacked, and that's terrible and

19   that shouldn't have happened to him.  But he's written up five

20   times just in the last -- in 2021.  Words are meaningless if

21   they're not backed up by action.  The actions matter, and

22   Mr. Belle's actions strongly imply that he has not changed.

23   And for that reason, the government submits that there's no

24   basis to change the sentence.

25             THE COURT:  You have to keep your mask over your nose,

L2NHBELS

1  OK?  Your nose is part of the whole respiratory sentence.

2              THE DEFENDANT:  I apologize.

3              MR. CASTELLANO:  Thank you, your Honor.

4              THE COURT:  Thank you, Ms. Castellano.

5              Mr. Pittell.

6              MR. PITTELL:  Actually, is it OK if I sit, Judge?

7              THE COURT:  I'm sorry?

8              MR. PITTELL:  Is it OK if I sit?

9              THE COURT:  Yes.  Yes, that's fine.

10             MR. PITTELL:  I guess, just as a housekeeping matter,

11  my second letter to the Court, which was submitted yesterday, I

12  forgot to change the date.

13             THE COURT:  Yes, yes.  It was filed yesterday.

14             MR. PITTELL:  It was from the prior letter.  So the

15  docket's going to reflect there's a letter dated November 4,

16  2020, but the header should make it clear it's supposed to be

17  February 22, 2021.

18             THE COURT:  I knew that.

19             MR. PITTELL:  I've been before your Honor for these

20  *Davis* resentencing hearings and in front of other judges as

21  well, and it's my perception of these proceedings that it gives

22  the Court an opportunity to look at what has gone on since the

23  judge presided over the prior sentence and whether or not there

24  should be a change or a reduction, because even though the

25  *Davis* case may have changed the guidelines or affected

L2NHBELS

1    mandatory minimums, it's my sense that when you imposed

2    sentence at the time, you weren't really looking at the

3    guidelines.  You were looking at Mr. Belle's history, both the

4    violence as well as his upbringing and the submissions of the

5    parties, and you imposed the sentence that you deemed to be

6    fair and appropriate.  And so the question becomes now, does he

7    get the same sentence or are there any circumstances that

8    warrant some type of reduction?  Because certainly in this

9    particular case there's nothing restricting you from imposing

10   any of those options.

11            So in my sentencing submission, I tried to point out

12   that in the last four years, though it's not a broad span of

13   time, there have been efforts by Mr. Belle to try and turn the

14   corner and move his life in a more positive direction.  His

15   letter indicates that he renounced YG.  He can address the

16   Court more on that.  I think assaults upon him are a reflection

17   of that.

18            THE COURT:  Is it, or is it a reflection of the fact

19   that it's a retaliation for the murder of Noah?

20            MR. PITTELL:  It could be, but also the fact that the

21   YG is not protecting him.  Could be indicia of that as well.

22   We just -- we don't know, but either way he's looking over his

23   shoulder at everybody, retaliation for the murder of Noah, as

24   well as retaliation for renouncing of the gang.  He has turned

25   to Islam.  Despite the limited opportunities that the MDC has

L2NHBELS

offered to inmates during this past year in terms of
programming and work, he's done whatever he could, and even in
one of my separate letters got what I thought was a very
favorable recommendation.

You've seen in my submissions that I have my questions
about these disciplinary infractions.  I know the records of
the Bureau of Prisons and that an inmate gets served with an
infraction, which is referred to as a shot, and then they're
thrown in the SHU.  Sometimes have a hearing right away, but
usually they sit there for a month or two.  And then comes time
from the hearing, and they just want to get out of the SHU, and
so they'll admit whatever they have to to get out of there.
Quite frankly, when I've talked to people about what the
hearings are, the notion of a kangaroo court comes to mind.  I
don't say that to denigrate the Bureau of Prisons and the way
they handle things, but it's not exactly full-blown due
process.  I'm a little concerned about the more recent ones
because Mr. Belle actually has a sexual harassment claim
pending against an officer in the Bureau of Prisons, and
there's an investigation going on about that.  And now
yesterday I see that he's being accused of that, and not only
accused but the hearing was within nine days, which is pretty
fast, in my experience, when someone gets a shot to go to a
hearing.

So that's why in my recent letter I, in essence, am

L2NHBELS

1   urging the Court to not give these records much weight, because

2   there's very little information on it.  And other than me

3   giving a proffer, an explanation, which I did in one of my

4   earlier letters, all the facts are not really on the table.  So

5   I urge you not to look at that too thoroughly in terms of

6   making your decision.

7          I'm sure you've heard this on every sentence that I

8   urge you to take into consideration what he's had to endure

9   during the past year.  Every inmate has been more or less

10  locked in their cell 23 hours a day.  They're not exactly given

11  proper PPE.  Look at the mask he's wearing.  This is a piece of

12  a blanket.  It doesn't even fit his face properly.  You would

13  think that at least now, a year later, the Bureau of Prisons

14  would be able to give them hospital masks, K95s, more

15  formfitting cloth masks.  And that's symbolic of what Mr. Belle

16  and all inmates have had to go through this past year where

17  they've had to wake up every day and wonder if today's the day

18  that I'm going to get it and what's going to happen to me, then

19  if I get it, am I really going to get medical treatment?

20         So I'm sure you've probably heard it from various bail

21  applications, motions for compassionate release, sentencings,

22  so I'll just say that what you've heard in those cases is what

23  Mr. Belle has gone through, and I ask you to take it into

24  consideration.  Obviously, the pandemic was an act of God, so

25  to speak, but nonetheless, the inmates suffered what is I feel

L2NHBELS

1    to be a terrible hardship, and at least some weight should be

2    given to that in fashioning your sentence.

3             Otherwise, I'll just defer to what I've said in my

4    submissions, and thank you for your time.

5             THE COURT:  Thank you, Mr. Pittell.

6             Mr. Belle.

7             THE DEFENDANT:  Yes, ma'am.

8             THE COURT:  Would you like to be heard?

9             THE DEFENDANT:  Yes, ma'am.

10            I got a -- you read my letter already, right?

11            THE COURT:  I read all of your letters.

12            THE DEFENDANT:  All right.  Basically, I want to

13   talk -- I just wanted to say, like, the -- I denounced my YGs.

14   They know I'm not YG no more.  I'm not Young Gunnaz.

15            THE COURT:  What does that mean?  How did they know?

16            THE DEFENDANT:  How do they know?  I told them that.

17            THE COURT:  You told your friends --

18            THE DEFENDANT:  Yes.

19            THE COURT:  -- who you're incarcerated with, I'm not a

20   YG anymore?

21            THE DEFENDANT:  Yes, yes.

22            THE COURT:  OK.

23            THE DEFENDANT:  I told them that, and that's how it

24   is.  But I wanted to break down the disciplinary process, too,

25   about the tickets.  Yeah, I caught disciplinary tickets, but

L2NHBELS

those is, like, minor, like, within the unit.  I'm not saying

I'm supposed to catch them, but you could catch them, like,

anytime.  Like, any officer could give you them.  It doesn't

matter.  Like, you can just be sitting here, you could do

something, the officer don't like, and he could just write you

up.

But those are in-house write-ups.  Those is not

write-ups that I was sent to the box for anything.  Not saying

it's OK that I caught them, but I did catch them because I did

something I wasn't supposed to do probably at the time or the

officer just had something against me.  I'm not saying

everybody's against you, but you do got officers in here you

see in the BOP, if you say one thing, they'll turn it into

something else and make it seem like you said this and you

don't really have a defense.  'Cause, like, in the state, they

have, like, a process where they got a recorder, you have a

representative, and you could really fight your case, like

fight your -- you can't do that here.  It's basically like if

he believe you or if he believe the officer, he going to go

with -- he just go with the officer because that's his peer and

he works there.  So he's going to take his officer word.

So I have to go through the appeal process which takes

about 60 days.  Nobody -- I'm not going to just fill out an

appeal process, and by the time I'm done with the box time, my

sanction and stuff be up, so I won't even go appeal it.  And

L2NHBELS

```
1    really, that's what I wanted to tell you about.  About --

2    basically, like what I did, basically I could stand up or I

3    could --

4              THE COURT:  You're fine.

5              THE DEFENDANT:  I'm fine?

6              THE COURT:  If you feel better standing up, you're

7    welcome to stand up.

8              THE DEFENDANT:  Basically, I would just like to

9    apologize to my family, the courts, you, for -- and especially

10   the Lora family.  Like, I just would like to apologize, like,

11   for the things that I did, and I know I did a lot of negative

12   things in this -- in my life of living.  So I just want to -- I

13   just want to become a better person.  I want to make it better.

14   Like she said in her letter, people change, like, and I'm not

15   saying, like, every day -- like, it don't take -- excuse me.

16   I'm nervous right now.

17             THE COURT:  Take your time.

18             THE DEFENDANT:  All right.  Words getting bunched up.

19             I'm not saying, like -- it takes time every day.  You

20   don't just change overnight.  So everything is just a process

21   for me right now, and due to me taking Islam and it's showing

22   me -- I learn how to speak Arabic, and I felt like I couldn't

23   do it, and that's what made -- motivated me to really get on a

24   verge of like I have to change for my son.  My son is nine

25   years old, and I'm missing his life every day.  I missed
```

L2NHBELS

basically nine years of his life.  So in like -- I'm trying to

at least make it home one day so he's of age to where we could

enjoy ourself together, you know what I mean?  That's all I'm

saying.  I understand they feel like what I did, I supposed to

be in jail for the rest of my life.  Yeah, I understand that,

but from where I'm coming from, like -- like, crime -- not

saying crime, like, the negative things around the

neighborhood, that's what's OK to us because I see this every

day of me growing up, going to jail.  And seeing people go to

jail and they come home and everybody giving them a hug, this

is what I grew up around.  So me seeing this, I just happen to

be one of the little kids that took heed to that, and I kept

going and I kept going thinking it's OK.  And me sitting in

these cells every day and I'm just looking at the walls and I'm

really thinking and I'm looking at my pictures, like, I'm

missing out on a lot. And I'm just wasting my time being in

these people cells.  Like, it's hard in here.

          But I just want to say I'm sorry to the courts.  I'm

sorry to the family, my family.  And I'ma just make myself

better.  That's what I have to do.  I can't really keep

saying it.  I'm going to do it for sure.  I know that for a

fact.  That's really all I got to say.

          THE COURT:  Did I correctly understand when you were

talking with Ms. Lora that you grew up with Noah and his

brother?

1          THE DEFENDANT:  I grew up with his brother.

2          THE COURT:  How much hold older was his brother?

3          THE DEFENDANT:  His brother was older than me.  I was

4     hanging out with my cousin Alexi.  Alexi is my cousin that hang

5     out with Chichi, her brother.  So me being around my cousin, I

6     was around him.  So he used to bring me to his house and stuff

7     like that.  Like, I know Moises since he was like five

8     years old.  Since he was about five years old.

9          THE COURT:  OK.  Anything else you want to say,

10    Mr. Belle?

11         THE DEFENDANT:  No, ma'am.

12         THE COURT:  All right.  Mr. Belle, federal law

13    requires me to consider the nature and circumstances of the

14    offense and the history and characteristics of the defendant.

15    In terms of you, I've considered your history and

16    characteristics.  You were dealt a very bad hand from birth.

17    As I indicated when I sentenced you the first time, given the

18    dysfunction that was in your life -- you had two parents with

19    drug problems and a father who was in jail for essentially all

20    of your life -- it is not shocking to me that you fell into

21    antisocial behavior.

22         While it's not shocking, the reality is that when you

23    were on the street, you were a violent, antisocial thug who

24    murdered a young man who, as you just said, you knew from the

25    time he was a child, and you showed absolutely no remorse for

L2NHBELS

1    the crime until you were standing in front of me at the time of

2    sentence.  While it may have affected you, as you told Noah's

3    sister, the reality is you bragged about the offense.  That's

4    not the action of someone who is remorseful as soon as it

5    happens; that's someone who is remorseful when you are called

6    to account.

7           Even then when you were first sentenced, the best you

8    could say to me about what you were thinking at the time was

9    that you were drunk.  As I said then and I will say now, we

10   have all been drunk.  We do not all jump on someone's head who

11   has fallen and is being sat upon by multiple men who are many

12   times his size and beating him to death.  That was a depraved

13   act.  I don't know -- there's simply no other way of describing

14   it.

15          You have a little boy who you mentioned who will only

16   know his dad through visits to him in prison.  Clearly,

17   Mr. Belle, that is a very sad situation because it continues

18   for yet another generation of boys in your family growing up

19   without a father in their life.  And that is tragic, and that

20   entirely lays at your doorstep.

21          You tell me that you are no longer affiliated with the

22   YGs and that you have been targeted in jail.  You tell me --

23   and this is in one of your letters -- that you have "forced" to

24   be impulsive in certain situations to protect yourself from

25   harm you received, and you received disciplinary infractions

L2NHBELS

1   for protecting yourself.

2            The attack on you was unacceptable, but I do not

3   accept at face value Mr. Belle's assertions that he is no

4   longer a violent thug that he was on the street.  I would note

5   that he has multiple disciplinary shots while in federal and

6   state jail and several involved violence.  I would have said,

7   because when I was preparing this, at that point you had a

8   clean disciplinary record from March 2020 till through

9   December.  So you had about nine months of clean conduct, and I

10  was going to say, Mr. Belle, that's a good start.  But then

11  January you fell apart, and you were back to being the

12  Mr. Belle that we all have come to know.

13           You know, Mr. Belle, it's not just the disciplinary

14  shots.  I get it that maybe some of them aren't as bad as they

15  look on paper, but you know what, Mr. Belle?  There are a lot

16  of people who manage to get in and out of jail with no

17  disciplinary record.  None.  You've got pages.  It's not just

18  because the disciplinary system is not the most pristine type

19  of system.  It's because you think that the rules don't apply

20  to Wendell Belle.  That you can do what you want to do.  And

21  that runs square into the rules of a facility.

22           Putting aside the Bureau of Prisons, it was so nice of

23  you to decide to join us today.  This morning we were going

24  back and forth with the marshals because you had decided you

25  weren't going to come down.  You want to say something about

L2NHBELS

that?

THE DEFENDANT:  Yes.  I never -- that's --

THE COURT:  Again, a misunderstanding?

THE DEFENDANT:  I just ask these people -- I didn't even refuse to come to court.  I knew I was coming to court today.  I just had a letter from my lawyer saying I might not go to court.  That was the only thing.  And they call me at 6:00 in the morning.  I said I'm taking a shower.  I never said I'm refusing court.  I been here since 10 o'clock.

THE COURT:  I know you've been here since 10 o'clock because at 9 o'clock we were told that you had come down.

THE DEFENDANT:  At 9 o'clock I was in the bullpen, ready, so I don't know if it was a back and forth.

THE COURT:  All just a terrible misunderstanding?

THE DEFENDANT:  Yeah.

THE COURT:  Again, many defendants we never have these misunderstandings with.

THE DEFENDANT:  I don't know because it wasn't no problem with me.

THE COURT:  Right.  Taking into account that evaluation -- Mr. Belle, if you don't keep that mask over your nose.  Thank you -- federal law requires me to impose a sentence that is reasonable and no greater than necessary to accomplish all the goals of sentencing.  I have considered all of the factors.  The fact that Mr. Belle has only been

L2NHBELS

convicted of a single 924(c) count rather than two does not

change the analysis that I had of Mr. Belle when he was first

sentenced.

In terms of the seriousness of the offense, this was

among the most serious of federal offenses.  The Young Gunnaz

gang, which defendant was a high-level leader of and which the

defendant acknowledged being part of for years, made life awful

in that area of the Bronx.  Mr. Belle and his gangster buddies

were shooting at each other, brawling in the streets, and

openly selling drugs.  Other residents of the area were trying

to raise their children to be law-abiding citizens, to go to

school and to go to work every day.  Just the offenses we know

about involve Belle leading the charge against Dykeem

Etheridge, an attack that led to Mr. Etheridge's death; Belle

participating in a gang shooting in which "Hump" was shot and

killed; the Lora murder, which I've indicated was depraved; a

shooting on November 26, 2013, near the Bronx courthouse where

you shot the driver of a car.

The murder of Lora was particularly depraved and far

from a heat-of-the-moment thing when Mr. Belle just got carried

away and shot a gun at somebody.  Mr. Belle and his buddies

intentionally went to rival territory looking for trouble to

show what a good member of the gang he is.  That was depraved

conduct.  That would be depraved conduct involving --

justifying a very long sentence even if you yourself never

L2NHBELS

kicked Lora, but you did kick him.  You kicked him, a 90-pound

weakling who had fallen to the ground and could not run away,

and that was a boy that you personally knew.  It's a very

serious offense.

I've considered the need to promote respect for the

law.  I see no respect for the law from this defendant.  The

defendant has been in jail most of his adult life, and as

indicated by the disciplinary record, he is not a model

prisoner.  I get that there's a lot of testosterone in jails

and no one wants to be perceived to be weak or a rat, but as I

mentioned, many manage to get through their time without being

repeatedly written up for violent acts, disobeying corrections

officers, and being insolent.

I've considered the need to provide just punishment

for the offense while avoiding unwarranted disparities.  I took

into account the facts of all the sentences that I imposed on

the roughly 30-odd Young Gunnaz members that I sentenced.  The

longest sentence that I imposed when added to existing

sentences was yours.  The next longest sentence was Scott at 33

years and Williams at 30 years.

I've considered the need to deter criminal conduct.

Mr. Belle, as I told you last time, I have to consider both

specific deterrence and general deterrence.  In terms of

specific deterrence, I appreciate that Mr. Belle says he is no

longer associated with the YG, but other than you saying that,

L2NHBELS

1    I really don't have any evidence that you've made a clean break

2    from your past.  If you're being truthful and if that sticks,

3    as you say, it's one day at a time, that's a positive move

4    towards rehabilitation.  But even so, I'm concerned about

5    Mr. Belle's propensity for violence.  It is worrisome to me

6    that Mr. Belle killed someone when he was 13 and then again at

7    19.  He's been involved in significant violent conduct,

8    including shooting at people, since he was a teenager.  I

9    certainly acknowledge that teenagers and young adults don't

10   have particularly good judgment, but there's little indication

11   that Mr. Belle's judgment or ability to abide by the rules of

12   society have improved with his age.  Since being convicted, as

13   I mentioned before, he is simply not a model prisoner,

14   although, again, you did have nine months of clean conduct, so

15   it's clear that you can behave yourself if you choose to do so.

16           In terms of general deterrence, it is important to

17   send the message far and wide that this kind of organized

18   criminal conduct that terrorizes and destroys neighborhoods

19   will not be tolerated.  Men and boys, because that is who are

20   in the Young Gunnaz, need to understand that they need to get

21   out of the gang or not join it in the first place unless they

22   want to spent substantial years in jail.

23           I've considered the need to protect the public from

24   the defendant.  Mr. Belle fired a gun on more than one occasion

25   attempting to kill rival gang members, and on one occasion for

L2NHBELS

1    no reason attacked and kicked to death a rival that, again, he

2    knew from the time the child was a child.  I appreciate the

3    argument that long sentences can be counterproductive.  As

4    indicated, this one, at a minimum, is going to guarantee that

5    your son grows up without a father, but I have to impose a

6    sentence that is long enough to give this defendant time to

7    mature to the point where he will not be so violent and so

8    dangerous to those around him, including other innocent

9    bystanders who could be killed by his conduct.

10           If this were just a matter of making poor choices,

11   which is frequently how this is phrased, in fact, maybe your

12   girlfriend said something like "he made a poor choice" or "the

13   accident of Lora," but that's not this.  This is not just a

14   poor choice.  This was a conscious decision to be part of the

15   Young Gunnaz, to participate in their activities, to be a

16   leader, and as to the Noah murder, to go to rival territory

17   with the intent to find someone to hurt.  The level of

18   depravity associated with the Lora murder is not just a matter

19   of being young and it's not just a matter of growing up in a

20   bad neighborhood, seeing people come home from jail and

21   thinking there's just no other way to live.  The ability to

22   kick to death someone you know reflects a level or lack of

23   empathy for your fellow man that leaves me worrying about your

24   ability to live within the rules of society.

25           I've considered the need to provide the defendant with

L2NHBELS

needed educational opportunities.  Mr. Belle, you need to get a

marketable skill so you can be gainfully employed when you get

out.  I take heart from the training you took when you were in

the juvenile facility.  Keep it up.  No reason why you can't

get a GED if you put your mind to it.  Beyond that, however,

you need to learn a trade so that when you get out of jail --

and you are going to get out of jail.  You're not going to get

a life sentence -- that you have a skill that will overcome

what is a major problem in getting a job, which is you will

have spent most of your young adulthood in jail.  So learn how

to do something that will allow you to get a job.

Having a job is the single most important factor in

avoiding recidivism.  But you've got to train for it, and that

means you've got to quit being a thug in jail and devote

yourself to becoming a productive member of society.  And you

know, sometimes, Mr. Belle, that means you have to just look

the other way when somebody does something or says something

that you don't like.  Mouthing off to correctional officers is

not a good strategy.  We all have to deal with people that are

not being nice to us.  Sometimes the right way to deal with

them is just to keep going and not engage.

THE DEFENDANT:  Yes.

THE COURT:  Or you can continue to engage and you can

continue to get disciplinary shots, and you could lose your

good time and you could spend more time in jail than you need

L2NHBELS

1    to spend.  That's your choice.

2            Ms. Lora, if putting him in jail for the rest of his

3    life would bring back your brother, this would be easy.  But no

4    matter how long I put him in jail, you're going to have the

5    same emptiness that you've got now, and there's nothing I can

6    do about it, and I am sorry.

7            As to Mr. Belle, he is serving and will serve nine

8    years in state custody for an attempted murder which is part of

9    his Young Gunnaz activity.  Upon careful evaluation of the

10   sentence I originally imposed on Counts One and Two, I now

11   believe that it is somewhat longer than necessary to accomplish

12   the goals of sentence.  Although I have to say, Mr. Belle, it's

13   not because of anything you have done, because I truly believe

14   that you are just as dangerous now as you were two years ago,

15   or whenever it was that I sentenced you.  But in walking

16   through the evaluation of what it means, I think that we can

17   solve and accomplish the goals of sentencing with a slightly

18   less lengthy sentence.

19           You're going to be right at 30, if I've done the

20   arithmetic correctly, when you complete the state sentence that

21   you are currently serving.  For all the reasons I have

22   discussed, a lengthy sentence is appropriate, but reimposing

23   the prior sentence would mean that Belle would be released,

24   assuming he keeps all of his good time, which given his current

25   record is not at all clear, when he is in his late 50s.  After

L2NHBELS

 1    a lot of thought, I believe that is longer than necessary to

 2    achieve the goals of sentencing.  I am considering the fact

 3    that the older men get, the less violent they are generally.

 4    Therefore, I believe that a longer period -- that that is a

 5    longer period of incapacitation than is necessary.

 6            Accordingly, I'm going to reduce the previously

 7    imposed sentence on Count Two to a period of incarceration of

 8    25 years consecutive to the current state sentence, to be

 9    followed by five years of supervised release.  If I have done

10    my arithmetic correctly and you behave in jail so that you

11    don't lose good time, that is going to put you out of jail

12    around the time you turn 50, which I realize, as you sit there

13    now, you think that makes you an old man, but it doesn't.  When

14    you're 50, trust me, you've got a lot of life left in you.  So

15    it's up to you, Mr. Belle, whether you make your time miserable

16    or whether you do something productive with your time so when

17    you get out of jail, you can live what will be 20 or 30 or 40

18    years as a productive member of society.

19            There are mandatory conditions of supervised release.

20    The defendant must not commit another crime.  He shall not

21    illegally possess a controlled substance.  He cannot possess a

22    firearm or other destructive device.  You must cooperate in the

23    collection of DNA.  I'm not ordering drug testing because drug

24    treatment will be required.

25            In addition to the standard conditions of supervision,

L2NHBELS

I'm imposing the following special conditions:  The defendant

must submit his person, residence, place of business, vehicle,

electronic devices, or other premises that are under his

control to search if the probation officer has a reasonable

belief that contraband or evidence of a violation of conditions

of release may be found there.  Any search must be conducted at

a reasonable time and in a reasonable manner.  Failure to

submit to search may be grounds for revocation.  The defendant

must inform any other residents that the premises may be

subject to search pursuant to this condition.

          The defendant must participate in an outpatient drug

treatment program as directed by the probation office.  The

program may include testing to determine whether the defendant

has reverted to the use of drugs or alcohol.  The defendant

must contribute to the cost of services based on his ability to

pay or the availability of third-party payments.  I'm

authorizing the release of available drug treatment evaluations

and reports, including the presentence report, to the substance

abuse provider.

          The defendant must participate in outpatient mental

health treatment as directed by the probation office.  The

defendant must continue to take any prescribed medication

unless otherwise instructed by the mental health-care provider.

The defendant must contribute to the cost of the service based

on his ability to pay or the availability of third-party

L2NHBELS

payments.  I'm authorizing the release of available

psychological and psychiatric evaluations and reports,

including the presentence report, to the health-care provider.

        The defendant must have no contact with any member of

the Young Gunnaz, although it is my hope that by that point

they will be a distant memory, or any other street gang,

including through social media.

        The defendant must report to the nearest probation

office within 72 hours of release, and he'll be supervised by

the district of residence.

        I'm not imposing a fine, because there's no ability to

pay.  I must impose a $100 special assessment.  You'll get

credit for any moneys you've already paid on that special

assessment.

        Is there any request for designation, Mr. Pittell?

        MR. PITTELL:  May I have a moment to speak with him?

        THE COURT:  Of course.

        (Counsel conferred with defendant)

        MR. PITTELL:  Judge, I would just ask that you

designate him to a facility as close as possible to the

metropolitan New York City area.

        THE COURT:  I'll request that you be designated to a

facility near New York City.  As you know, I have no authority

over where you actually get designated, but I'll make the

request that they keep you close to New York City.

L2NHBELS

1          To the extent you have not given up your right to

2    appeal your sentence through the agreement you entered into

3    with the government in connection with your guilty plea, you

4    have the right to appeal.  If you're unable to pay the cost of

5    an appeal, you may apply for leave to appeal *in forma pauperis*.

6    The notice of appeal must be filed within 14 days of the

7    judgment of conviction.

8          Anything further from the government?

9          MR. CASTELLANO:  Your Honor, I may have misheard you

10   before, but just to be clear, "Hump," as I know you know, was

11   not killed, he was nearly killed.

12         THE COURT:  I'm sorry, nearly killed.

13         MR. CASTELLANO:  Thank you, your Honor.

14         THE COURT:  Same point.

15         Anything further from the defense, Mr. Pittell?

16         MR. PITTELL:  No, thank you.

17         THE COURT:  Mr. Belle?

18         THE DEFENDANT:  (Shakes head.)

19         THE COURT:  Thanks, everybody.

20         (Adjourned)

21

22

23

24

25